May it please the court, I'm here on behalf of the plaintiff in a case involving an employee stock option plan and a claim for breach of the fiduciary duty of prudence under ERISA. And I know it's a little unusual to do this, but if the court will indulge me, I'd like to just take a step back for a moment and just give a little bit of background on the state of the law here because it's been a while since we've briefed these cases and a lot has happened in the intervening time that I think is relevant to understanding how we should approach the specific allegations in this case. So employee stock option plans are sort of an unusual creature. They're subject to two somewhat overlapping regulatory regimes. Because they contain securities, company stock, they're can sue under the securities laws based on your holdings in those. At the same time, Congress specifically made them subject to ERISA as well and to the duties of prudence and loyalty that are enshrined in ERISA. And the only exception carved out for an ESOP in ERISA is that you don't have an obligation to diversify an ESOP because it's obviously holds just one asset. Other than that, ESOPs are supposed to be subject to the same duties as all other ERISA investments. So they shouldn't be treated in that respect differently and the duties that the fiduciaries have shouldn't be different than it would be for a mutual fund or any number of other, you know, real estate investment trust or any other number of fund investment options. But this case is all centered on the one exception you just mentioned, right? That's what the whole case is about. Isn't that right? Well, you said it's like any other investment fund except for one thing, right? And that's what we're talking about. In other words, you know, what could be considered conflicting duties of the fiduciary, right? That's what we're talking. That's all we're talking about in this case. So, you know, all this background about mutual funds and other kinds of funds, you know, I mean, that doesn't have anything to do with this case, right? We just have to do with the conflict. That's what this whole case is about. Or is there some other issue? Well, I would disagree slightly with that because the one exception that I pointed to is that you don't have to diversify an ESOP. And we're not claiming that they should have diversified the ESOP. What we're claiming is that they should have taken action to make sure that the ESOP remained a prudent investment. But the way to do that... But counsel, again, joining my colleague, I mean, the reality is we're talking about how Dudenhofer applies here and whether or not the trustee in this case should have revealed something that may or may not have resulted in a substantial loss in the value of the fund. That's what we're really talking about. So in my case, I'm concerned about, in this case, the California Public Utilities Commission itself said that its reporting requirements were confusing. How unreasonable could it have been for Boada, or however you say his name, not to reveal the ex-party communications since the regulations themselves were confusing? The regulations themselves may be admittedly confusing, but they were still known to Edison, which is why they ultimately ended up being fined $16 million for violating those rules. Well, how are they known to Edison, counsel? I'm sorry. How are they known to Edison? There's two parts to this question. One, I think I tend to agree with Judge Smith that the burden on Mr. Boada to disclose or make these disclosures when he's not really sure if it is the ex-parte communication is a disclosure is one thing. But the other thing for me is I don't see where in your second amended complaint you suggest that disclosure of the alleged fraud was inevitable here. Where do you allege that? Especially Mr. Boada. I mean, you make a reference to Mr. Craver, but you don't really specify regarding Mr. Boada, and I think that's maybe key. I'd like to address those two issues in turn. First, Judge Smith's question. In September of 2014, you have the Chief Ethics Officer and Compliance Officer of Edison emailing all the senior staff, reminding them of the situation and that how they all were already aware of these issues, but they have to be even more vigilant. So I don't think it's fair to infer that this was something that the senior executives... What is the situation? I mean, there's not a lot of clarity on exactly when you say the that connects to Boada or what that means. Well, look, I mean, the situation I think is the ex-parte communications, particularly the meeting in Poland and the quid pro quo involving the greenhouse gas initiative. And if the Chief Ethics and Compliance Officer is telling you we were already aware of these rules, but we have to be even more vigilant about them, I don't think it's fair to infer that these rules were too confusing prior to that to know or understand. It's hard to pick a point, if we follow your logic, where to make a disclosure because the facts kept changing, right? And most importantly, what the ALJ recommended was 58 violations, something like that, came down to how many? Half a dozen? Eight? Something like that? So was he supposed to disclose the 58 at that point? I mean, as Judge Smith and Judge Bernier said, the regulation was, I think, somewhat opaque. And so was the situation. I mean, in other words, it started out as a process contact, somehow transmuted itself to a substantive contact. So all these things kept changing during the course of the events, right? There was not a certain point that said, okay, you're guilty of six, seven, eight violations, right? Until the very end. When the PUC itself, you know, made its judgment. So what should it have been disclosed? Let me ask this question. So before the PUC made its judgment on how many violations there were, at what point should either trustee have said something, and what should he have said? As early as the trustee became aware of the fact that there had been this meeting in Poland and this discussion of a quid pro quo, which I'm putting aside all the other communications, that particular meeting and that particular deal are not very confusing. They're not complicated. I mean, that's a kind of rule anyone can understand. And we allege that he became aware of that as early as the beginning of the class period, March 2014, through the regular communications he received and updates he received about the settlement discussions. Therefore, he should have made that disclosure then. Now, he can't make it himself directly to the public. But doesn't the complaint... He has to go to... If I can ask, but does the complaint also allege that the Attorney General retrieved the notes from the Warsaw meeting in January of 2015, and that the press reports did not begin to emerge until, I think it was after February 2015 disclosure? So I'm trying to figure out what was supposed to happen before that time, because the complaint also alleges that Edison's stock price peaked in early 2015. And if the probability of disclosure did not increase until 2015, after the stock price had peaked, would the perceived benefits of an earlier stock disclosure, such as a softer correction, still have applied? And how would Mr. Volga have known that? I would say that they would absolutely be more likely to apply earlier. The earlier you correct the stock disclosure in this case, the less inflation there's been, and the less implied volatility there is in the stock, and the less time the misrepresentation to the market has gone on, all of which should counsel in favor of an earlier rather than later disclosure. The idea that inevitability of disclosure has sort of become the watchword of these cases, that is a relatively recent development. That's not something that is even mentioned in Dudenhofer. Dudenhofer does not draw a distinction between cases where disclosure is inevitable and where it isn't. The Second Circuit drew that distinction in Jander. But even in Jander, the disclosure wasn't 100% inevitable. It was just more likely than not. But Jander is a case you rely on, isn't it? I mean, the reality is our Amgen case got summarily reversed. It wasn't fled with enough specificity. This case, unfortunately for you, probably has the same problem, but you rely on Jander. And now it seems like you're criticizing Jander,  Is that clear here that there was an inevitable disclosure that would have occurred? I want to be clear that I'm not criticizing Jander. We embrace Jander because the Jander court did what most other courts have not done, which is to look at all the allegations in concert, the generalized ones and the specific ones, and consider them all together. And in that case, the inevitability of disclosure was one of the specific allegations that was more compelling. Here, we make different specific allegations, but it still should be incumbent on this court to consider them all together. What has happened is that all the courts have found this one piece of language in Dudenhofer that says the fiduciary should consider whether publicly disclosing negative information will cause a drop in the stock price, and they should consider that before you decide whether it would do more harm than good. They've taken that language of considering that as one among many elements and turned that into everything, so that if there is even a remote possibility of any fiduciary can imagine a world where there might be a stock drop from disclosing earlier, you can never plead a case against that fiduciary. It essentially shuts off any case that doesn't have the exact same facts as this inevitable sale that Jander found. And indeed, even the Second Circuit received a general election. Do you believe that your second amended complaint complies with Dudenhofer? Yes, very much so. It contains general allegations that the court and Jander considered to be… Is that the problem? It contains general allegations and not specific allegations? No, it contained both. It contained both general and specific allegations. The specific allegations involved the increased implied volatility of the stock, the way the stock price inflation progressed over the course of the class period. All of those, the way the bonds were trading. All of those issues should have been taken into account by the defendants and they should have said, well, yes, sometimes an earlier disclosure might be more dangerous, but looking at the other factors surrounding what's going on here, going on with the stock and looking at the way this is progressing, the reasonable thing to do is to disclose this particularly galling misconduct earlier rather than later. Mr. Fondrock, you don't have to stop, but you're into, you've got a minute and 44 seconds left. Do you want to save any time for rebuttal? I'd like to save the remainder of my time for rebuttal, thank you. Very well. Okay, Mr. Gildersleeve, I believe you're next. Thank you, and may it please the court, John Gildersleeve for the appellees, Mr. Craver and Mr. Boada. The district court here applied the Dudenhofer standard in exactly the same way that multiple courts of appeals have applied it, and in exactly the same way that this court applied it in the Laffin against HP case. That's the right way to apply the standard, and the dismissal should be affirmed. I'd like to pick up the discussion of the Second Circuit's Jander case, if I could, because as the court has noted, that really is the only authority that the plaintiff relies on in support of her position here. And what's critical in Jander, aside from the fact that an inevitable disclosure was pleaded there, was that even though the Second Circuit accepted the generic allegations as part of the universe of pleaded facts, the Second Circuit also said that those generic allegations do not even come into play, that's the court's words, unless the plaintiff has shown in a fact-specific way that further investigation is not needed, and that disclosure would not be premature. That is exactly this case. For the reasons that the court has observed in relation to the CPUC proceeding, further investigation would be needed before a premature disclosure to the market that would cause harm, and that disclosure would be premature. I'd like to walk through that CPUC proceeding in a little bit more detail, because I think it illustrates why the preliminary disclosure here would likely be inaccurate, would likely be incomplete, and is a disclosure that a prudent fiduciary very easily could conclude would do more harm than good. And these facts are all pleaded in the complaint. This is an eight-month or ten-month proceeding before the regulator, depending on how you bookend it, starting in February 2015 and ending in December 2015. What prompted it was that Edison learned new facts about a communication that had occurred in the past, that's known as the Warsaw meeting, and so Edison filed a notice of it. That prompted the consumer groups, which effectively were Edison's adversaries in the proceeding, to call for an investigation, and so that's what happened. The ALJs at the CPUC ordered the company to produce documents, reflecting its communications with the regulator over the prior two years. The company did that, and it posted them on its website. Then Edison and the consumer groups all briefed the issue of just how many communications should have been reported, but weren't reported, if any. The consumer group's position was that more than 70 communications should have been reported, and therefore were rule violations. Edison's position was that the number was zero, meaning we reported, we filed all the notices we were required to file, and there were no violations. As it turned out, in August of 2015, which is after the class period, the ALJ issued an opinion, it's in the record, and it's an over 50-page opinion, that interpreted the CPUC's reporting rules, which are somewhat nuanced, they've since changed to be clarified. And the ALJ found that 10 communications should have been reported, but weren't reported. Then in December, the CPUC, which effectively was acting as an appellate body over the ALJ, reversed in part, and found that the number of unreported communications actually was eight. So during this whole period, the range of potential violations was from over 70 to zero, and it wound up being eight. The plaintiff's position in the complaint is that Mr. Boada, who incidentally is the treasurer of the holding company, and has no personal involvement or responsibility in applying these reporting rules, that Mr. Boada should have precipitated a disclosure to the market at some point before this proceeding, or during the proceeding, of an uncertain form. It's unclear what it would say. It very likely would not say what the CPUC eventually found, which was there are eight rule violations, because no one knew that, and the company's position was that there were zero violations. So whatever this disclosure would have been, a prudent fiduciary could very easily conclude that it would just create uncertainty in the market, which is what the market likes least. It's important to remember, I think, the practical reality of what the plaintiff's claim is, because the Dudenhofer test is somewhat abstract. The plaintiff is saying that a fiduciary in Mr. Boada's position should have caused harm to the Edison stock fund, and done so intentionally. So if you're an Edison employee, you have less money in your retirement account on Tuesday than you did on Monday, as a direct result of something that your fiduciary deliberately did. That's a very odd case. Dudenhofer recognizes that there are some circumstances in which a fiduciary will be required to do that, but it's not going to be every time the stock drops. It's not going to be every time a securities class action is filed. And in this case... Mr. Gillespie, I think you hit on some important points, because I do think that Mr. Bodroff is frustrated somewhat, and I think understandably so, by the Dudenhofer standard that is, as you call it, somewhat abstract. I think the question is, is it too abstract that plaintiffs will never be able to meet that standard? And so I'm curious what you think. If the complaint is not sufficient here, what could the plaintiff have alleged to plausibly state the duty of prudence in that it was violated under Dudenhofer? Yes, Your Honor. See, in this particular case, I don't think such a complaint can be pleaded, but the missing facts would be, one, a straightforward fraud, maybe something in the line of what was alleged in Jander, which is the company's failure to write down the value of an asset by over $2 billion, and the inevitable disclosure of that fraud. In Jander... Because it seems like maybe what you were arguing, at least from the briefs, what I can infer is, you know, the complaint must allege something, you know, very drastic, or that the company is essentially on the brink of collapse, or that the stock is worthless. And I'm just trying to figure out how is that any different from the presumption of prudence explicitly rejected by the Supreme Court in Deuteron. Yes, Your Honor. So we're not alleging that the plaintiff needs to show a brink of collapse, right? That would be what was the presumption of prudence, and that's no longer the law. I think Jander is illustrative again, because in that case, IBM, which was the defendant, was not on the brink of collapse. It was a perfectly healthy company. But the fraud alleged there was one that would inevitably be disclosed. That's not the case here. We're 180 degrees from that. And again, the fraud there was numerical. It was a mathematical alleged fraud. That's not the case here. This case involves the application of these nuanced rules. You know, the test is a difficult test. I think it's difficult by design. The Supreme Court explained in Dudenhofer why it was announcing this test, and the court in Dudenhofer said that it had done the requisite balancing, which is the Supreme Court's phrase. So, you know, the arguments that the test should be recalibrated or diluted in some way just don't match up with Dudenhofer, because the court has done the work. The requisite balancing has already been done. You know, there's also the notion that, well, the court did away with the presumption of prudence, and therefore the test must somehow be easier. I would submit that that reading of Dudenhofer just ignores the latter half of the opinion. It ignores the court saying that it had done the balancing. And, of course, there's no decision that we're aware of that has interpreted Dudenhofer as lowering the bar for pleading this sort of claim. There are decisions that interpret it as raising the bar, but there are none interpreting it as lowering the bar. So if I—I just want to be sure I understand your point. Unlike Jander, which would have inevitably had to be disclosed, you take the position that because the company thought originally there were no disclosure requirements at all compared to the consumer group's claim of 70, that until the inevitability of disclosure was finalized, if you will, or clarified by the PUC board, that the cause of action didn't originate. Is that a fair way to state it? Your Honor, I would put it slightly differently. It's not just that the company's position was that there were zero unreported communications. It's that the number of communications that were unreported, if any, and their purported effect on the stock price was all unknown during the class period. So, you know, that link to the stock price is also very important here in terms of the knowledge predicate. You know, Mr. Boada has no involvement in applying these rules. He has no involvement in the communications themselves, right? And so even, you know, counsel referred to the Warsaw meeting, which is the main communication here, being kind of described to the company. I think that's a reference to paragraph 84 of the complaint. Mr. Boada was not briefed about that meeting when it happened. So there's these predicate knowledge elements that aren't satisfied. But even if Mr. Boada knew about the communications, knew they should have been reported, in his opinion, that doesn't mean he knew that not reporting them caused the stock price to be artificially inflated. That's the harm to the employees invested in the stock fund that's alleged here. Mr. Boada has no involvement in securities reporting. He has no reason to precipitate an investigation or a disclosure when, again, as the court said, the company's position was that no reporting was required. Are you taking the position that Boada should never have been sued? In effect, he was the wrong party. I know you've got another defendant as well, but was he the wrong party? If this claim is to be asserted, Mr. Boada is a member of the Trust Investment Committee. And so that's the committee that, you know, under the plan document, are the named fiduciaries of the plan. Well, Mr. Gillespie, for the purpose of this appeal, you aren't contesting, are you, that Mr. Boada had this information or had the opportunity to get it, right? Are you contesting that on this appeal? No. We are, Your Honor. We're contesting that Mr. Boada had the knowledge necessary, even for the Dudenhofer could not have concluded test to apply for it to be weighed. Let me ask you about that because it seems like we're required to construe all reasonable inferences in plaintiff's favor. So why is it not enough that the complaint alleges defendants knew the stock was artificially inflated due to the nondisclosure of the ex parte communications and that the earlier disclosure would have been less harmful because it results in less reputational harm and a softer correction? Well, Your Honor, even the plausibility standard requires sufficient factual matter in the complaint to make the claim plausible. It can't just be a conclusory allegation. Are you saying it is a conclusory allegation with respect to Mr. Boada here? Yes, Your Honor, and here's why. All the complaint does to link Mr. Boada to knowledge that the stock price is inflated is one, to allege that he is sophisticated and therefore he would deduce that the stock price is inflated. I think that's conclusory. And second, the complaint refers to the email that my friend mentioned earlier about the situation. I think the court was exactly right. There's no situation identified in that email. The email itself is in the record. Mr. Boada, there's no allegation that Mr. Boada received it. And Mr. Boada was not briefed about the Warsaw meeting. So it cannot be that any executive in a company who is over a certain level of seniority and therefore sophisticated can be tagged with knowledge that any given regulatory reporting violation will artificially inflate the stock price. Again, that's different from gender, right? I think it's fair to assume that if an asset is overvalued by billions of dollars, one would know that affects the stock price. Let me ask this question. Did the district court reach this issue? In other words, you know, how much Mr. Boada knew, you know, whether because of his position as treasurer, you know, it's, I wouldn't say patent, but, you know, a reasonable inference that he would keep track of these kinds of matters that would affect the stock price. Did the district court reach any conclusion on that or did it go into that issue? In part, your honor, in one of the earlier decisions in this case, that's at the supplemental excerpts, page 12. In a footnote, Judge Kronstadt found that the defendants could be tagged with knowledge of reporting violations, but the district court did not find that they therefore could be tagged with knowledge that the stock price was artificially inflated. And that's the gateway even to accessing the due and offer test. If either of my colleagues have additional questions, you're over time, but of course, my colleagues can ask whatever questions they wish. Any other ones that you have? Not for me, thank you. No, thank you. All right. Thank you, your honor. So, Mr. Bondaroff, do you have a little rebuttal time? Yes, I'll keep this as brief as I can. All the cases that are cited by defendants and that have happened in the wake of due and offer almost exclusively put the burden on plaintiffs to know more than plaintiffs, especially ERISA plaintiffs, who are just employees, could ever possibly know in advance of having discovery. Isn't that the problem, though, with the plausibility of specific pleading standards generally? Isn't that the complaint that people have? No, no, it's different here. For one thing, ERISA, and as Judge Friendly said many years ago, is supposed to be a trustee. It's supposed to be the highest duty known to the law. It's supposed to be a higher duty that the trustee owes to the employees than, say, the company owes to shareholders or they owe to just a person on the street. But didn't what Judge Tashima mentioned about the change in the law with respect to trustees in this particular context address what you're talking about? The traditional trustee role has been altered in the ESOP situation under due and offer, has it not? No, not in that way. In fact, what due and offer stands for is the proposition that that trustee duty is as strong as ever. It is at least as strong as it is to other ERISA fiduciary investments, and it is stronger than the common law of trust duty. That is in the statute, and that is confirmed in due and offer. My concern is that we put all the emphasis on the plaintiff having to know knowledge they couldn't have and allege facts they couldn't allege and make inferences they can't make so that we can protect ERISA fiduciaries who are supposed to be trustees with the highest duty known to law. Let me ask either of my colleagues if you have additional questions for Mr. Vonderhaup. No, thank you. All right, thank you, gentlemen, for your very helpful argument in this case. The case of Wilson v. Craver et al. is submitted. We thank you, colleague.
judges: Tashima, M. Smith, Murguia